No. 83-97

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

REBECCA CAMPBELL, Widow of Raymond
Campbell,

Claimant and Respondent,

-vs-

YOUNG MOTOR COMPANY, Employer,

and

FEDERATED MUTUAL INSURANCE,

Defendant and Appellant.

APPEAL FROM:  The Workers' Compensation Court, The Honorable Timothy
Reardon, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Corette, Smith, Pohlman & Allen; Robert Carlson and
Dolphy Pohlman argued, Butte, Montana

For Respondent:

Greg J. Skakles argued, Anaconda, Montana

Submitted: November 30, 1983

Decided: June 28, 1984

Filed: JUN 28 1984

Ethel M. Harrison
_____
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Defendants, Young Motor Company, employer, and Federated Mutual Insurance, the insurer, appeal a judgment of the Workers' Compensation Court awarding death benefits to Rebecca Campbell, the widow of Raymond Campbell, who committed suicide five years after he sustained a compensable injury. The trial court found there existed a causal connection between the injury and the ultimate suicide. We affirm.

The primary question, one not decided by this Court, is whether the Workers' Compensation Act permits recovery for a suicide, if it can be shown that a previous compensable injury was a substantial contributing cause of the suicide. Assuming that such recovery is permitted, the second question is whether substantial credible evidence supports the findings of the trial court that Raymond Campbell's injury was a substantial contributing cause of his suicide. The third issue is whether the trial court erred in awarding costs and attorney fees to the claimant under section 39-71-611, MCA, of the Workers' Compensation Act. This issue is controlled by our answer to the legal question and to the sufficiency of the evidence question, for, under the statute, claimant is entitled to costs and attorney fees if the order is affirmed.

Before setting forth the facts on which the claim was based, we discuss first the question of whether a claim for death benefits under the Workers' Compensation Act can be based on a contention that an injury eventually led to the suicide of the employee. The employer argues that suicide

was of personal origin and was a superceding intervening cause as a matter of law.

This state has no statutes dealing with the effect of suicide on the right to recover death benefits. One statute in effect at the time of the injury (January 8, 1974), bears on the question of causation. Section 92-608, R.C.M. 1947, provides in substance that if an injury is the proximate cause of death, death benefits are payable even though the death did not immediately follow the injury. The last part of this statute simply provides that there is no liability for compensation after a worker's death if the worker dies from some "cause other than the injury,. . ." This Court, in Breen v. Industrial Accident Board (1968), 150 Mont. 463, 436 P.2d 701, set forth the requirements of proximate cause under this statute, and specifically stated that:

> ". . . this, of course, does not mean that the injury must be the sole cause of death, but it does mean that an injury must be a substantial contributing cause in the sense that death would not have occurred but for such injuries." 150 Mont. 472-473, 436 P.2d at 706.

The employer argues for an absolute rule that suicide is per se an intentional act that is an independent, intervening cause, and therefore that as a matter of law, recovery of death benefits cannot be permitted. Claimant argues, on the other hand, that recovery of death benefits is permitted if the required connection between the compensable injury and the suicide is established.

Both the majority and the minority rules of other jurisdictions permit recovery of death benefits where there is a suicide. In effect, no jurisdictions recognize suicide as an intentional act that automatically breaks the chain of causation to defeat a claim for death benefits. Both the

majority and the minority rules are set forth in Larson's _Workmen's Compensation Law_, Vol. IA, § 36.00, at 6-117:

> "Suicide under the majority rule is compensable if the injury produces mental derangement and the mental derangement produces suicide. The minority rule is that suicide is not compensable unless there has followed as the direct result of a work-connected injury an insanity of such severity as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy without conscious volition to produce death."

In applying the law to the facts here, the trial court adopted the majority rule, and we approve.

The minority rule, as _Larson_ explains, was once the majority rule, but it ". . . was gradually displaced as majority rule by the chain of causation test, which found compensability if the injury caused the deranged mental condition which in turn caused the suicide." _Larson_, supra, § 36.10, at 6-118. In explaining the role of intervening cause in the analysis, Larson explains that the focus must be ". . . not on the employee's knowledge that he is killing himself, but rather on the existence of an unbroken chain of causation from the injury to the suicide . . ." _Larson_, supra, § 36.30, at 6-136. In other words, as _Larson_ explains:

> ". . . if the first cause produces the second cause, that second cause is not an independent intervening cause. The question whether the actor appreciated the consequences of his act should not be decisive on the fundamental question whether that act was the natural and forseeable result of the first injury." _Larson_, supra, § 36.30, at 6-136.

While the employer's position is an easy one to assert and apply, that is, that suicide is per se intentional and therefore a sufficient intervening cause to cut off the chain of causation leading from the initial injury, this position adopts too hard and fast a rule on the dynamics of cause and

- 4 -

effect. The more reasonable and humane rule is one that was set forth by the Delaware Supreme Court in Delaware Tire Center v. Fox (1979), 401 A.2d 97, where the Court held that death benefits were available where the worker committed suicide. The Court stated:

"In applying this [chain of causation] test, death by suicide would be compensable if it is caused by severe pain and despair which proximately results from a compensable accident, and is of such a degree as to override normal and rational judgment. A suicide committed under such circumstances cannot be said to be 'intentional' even though the act itself may be volitional. (Citations omitted.)"

This chain of causation rule recognizes that the injury and the post-injury trauma, mental as well as physical, may take a path anticipated by no one, but nonetheless be traceable to the injury itself. We are convinced, furthermore, that the majority rule we have adopted here more completely fulfills the statutory duty (section 39-71-104, MCA) imposed under the Workers' Compensation Act to liberally construe its provisions in favor of the employee.

On the question of causation, the employer argues that the suicide note itself set forth the reason Campbell took his own life, and that it supports only a finding that the injury was not the precipitating cause of his suicide. Further, the employer argues that the opinion of a psychologist, who performed a psychological autopsy on Campbell by using his previous medical records and history, was faulty because the psychologist failed to inverview two fellow employees at Greyrock Trucking who would not have supported the opinion that Campbell had constant pain and that he was in a deep depression.

Before his death, Campbell wrote a suicide note that read:

"To Mom [on outside of envelope]

"I'm going home with Grandma and Grandad. [Both had predeceased him.]

"Be sure and tell [my son] someday why I went there.

"I'm very sorry mom but I just couldn't let someone else take he[r]?

"Love you always."

The employer argues that proper application of the chain of causation test shows that despite any depression precipitated by Campbell's inability to work and his heavy drinking, the substantial factor in his suicide was the loss of his wife and children who moved out one month before the death because of his heavy drinking and abusive behavior. The employer also attacks the opinion of a psychologist who performed a psychological autopsy of Campbell, and who concluded that the injury was a very significant and very substantial cause of Campbell's depression and ultimate suicide. The employer argues that the opinion was faulty because the psychologist did not interview Campbell before his death and because he failed to interview two fellow employees of Campbell at Greyrock Trucking who would not have supported the psychologist's opinion as to Campbell's depression or his suffering from pain as the result of his injury. The evidence, however, fully supports the trial court's findings and conclusions.

On January 8, 1974, Raymond Campbell seriously injured his back while working as a car body repairman for Young Motor Company in Anaconda. The injury led to two surgeries, but the surgeon testified that he expected Campbell to have continuing pain in his lower back and right leg for the rest of his life.

After the injury, Campbell had medical treatment and physical therapy, but the pain in his back and right leg continued. Campbell was referred to Dr. Charles R. Canty in Butte, who performed a myelogram. The results showed surgery was necessary, and in September 1974, Dr. Canty performed a laminectomy. The pain returned, and approximately six months later Dr. Canty performed a second operation. He removed scar tissue from nerve roots, retained fibrous tissue, and performed a spinal fusion. The doctor told Campbell then that he should find a new and less strenuous trade.

For two and one half years after his injury, Campbell was unable to work. During this time, he abused alcohol on a daily basis and was depressed most of the time. He told his wife that the pain medicine was not relieving the pain and that he drank alcohol to relieve the pain. He finally returned to work at Anaconda Ford in the summer of 1976 as a body repairman. But the pain and the drinking continued.

Campbell was deeply depressed for the entire period after his injury. He was afraid before both back operations that he would end up paralyzed, and he continued to fear that he would someday be paralyzed and unable to support his wife and children. He became more and more withdrawn and no longer engaged as frequently in the activities he formerly enjoyed such as hunting, fishing, and recreational mechanical work. While working for Greyrock Trucking, however, Campbell occasionally went to the woods to cut and haul wood.

The situation for the wife and children became intolerable and his wife threatened to leave him unless he stopped drinking. But the drinking continued until November 1976, when Campbell admitted himself to Galen State Hospital and was diagnosed as suffering from acute alcoholism. He

checked out four days later rather than staying for treatment. He did, however, manage to stop drinking for almost a month, but then he started again, on a daily basis, and usually to the point of intoxication.

Campbell continued working for Anaconda Ford until the summer of 1977, when he went to work for Greyrock Trucking in Anaconda as a truck driver. Medical testimony established that truck driving would most likely worsen Campbell's lower back and leg pain.

Campbell's relationship with his wife and children continued to deteriorate while he worked for Greyrock Trucking. Although Greyrock personnel described Campbell as an "excellent employee," and that they did not observe that Campbell was ever in pain, other testimony established that Campbell was in constant pain and was drinking even more. His wife testified that while at home he was often drunk and belligerent and physically abusive to her and to his son. She testified that although Campbell had been jealous and over-possessive of his wife since the beginning of their marriage, his jealousy and abusive behavior intensified after his back injury. His temper flared often and he wrongly accused her of being unfaithful. The situation got so bad that Campbell's wife took the children and moved to Butte to live with relatives.

Campbell was extremely upset by the prospect of losing his family, and after his family had moved out, he drastically curtailed his drinking in an effort to get them to return. In fact, in the month before his suicide, Campbell did not drink at all. Although Campbell's wife and children did drive to Anaconda to see him several times during this month, they did not return to the family home.

On or about January 10, 1979, Campbell committed suicide by a gunshot wound to the heart.

The trial court realized full well the difficulty of assessing and analyzing the evidence in determining the issue of proximate cause based on the chain of causation test. The court stated:

> "Where can this Court find the bright line that distinguishes the intentional act, the act premeditated by intellect, from the act that is the result of the diseased mind? This Court must, and can only, discover this line by examining the pre-accident and post-accident conduct of the decedent, conduct which steps forward and speaks on his behalf, and the expert testimony of the psychologist who performed the psychological autopsy. . ."

The trial court continued:

> "The preponderance of the credible evidence in this case reveals the descent of a proud, active and accomplished working man into a suicidal depression; his descent was powered by the constant pain which resulted from his industrial accident and was fueled by his alcohol abuse, forced inactivity and fear of paralysis."

Against the background of Campbell's steady, and seemingly inexorable decline after his 1974 back injury, the employer argues that Campbell's intervening volitional act of suicide was the proximate cause of death rather than the back injury. The employer argued that despite any depression precipitated by Campbell's inability to work and heavy drinking, the substantial factor in his suicide was the loss of his wife and children who moved out one month before the death because of his drinking and abusive behavior. The trial court thought differently.

The trial court, as the finder of fact, met this argument by stating:

> ". . . Looked at narrowly, the last causal event in the chain of events that culminated in the decedent's suicide was his wife's departure, but this artifically narrow view ignores the chain of

events starting with the claimant's industrial accident, and continuing unbroken until he committed suicide. That chain, as demonstrated by Dr. Walters' [the psychologist] testimony, may be summarized simply as follows:

"(1) The decedent's industrial accident severely injured him, prevented him from working for two and a half years, caused him to suffer almost constant physical pain, fear of future paralysis, and a consequent inability to work, and depression; (2) He drank alcoholic beverages to lessen the pain and this intensified his depression and consequent distorted view of reality; (3) His increased and continuing pain, depression and distorted view of reality caused him to become more abusive of his wife and children and to continue to drink excessively; (4) His wife left him because of his excessive drinking and abusive behavior."

The trial court eloquently and poignantly placed the cause and effect of this chain of events in a perspective that is almost invariably better appreciated by the trier of fact:

"This sequence of events is roughly analogous to the events that can occur when a gust of wind strikes a tree branch heavily laden with moist snow causing the snow to fall to the snow-covered slope and move forward downhill with increasing speed and size until it becomes an avalanche that lays waste to all that comes within its path. While the cause in retrospect may appear remote and slight, the chain of events it engendered were, on close examination, unbroken and ultimately overpowering. The decedent's industrial accident set in motion events that coursed through his life with increasing destructive force and that, in retrospect, proximately caused him to take his own life."

The employer challenges the trial court's findings, and argues that even under the chain of causation test applied by the trial court, the findings are not supported by substantial evidence. The employer argues that the opinion of the psychologist is legally deficient because he did not personally interview Campbell before his suicide, and because he failed to interview two fellow Greyrock Trucking employees, who, in observing Campbell at work, had a

different perception of him than that provided by Campbell's wife, mother and friends.

Undoubtedly, it would have been helpful for Dr. Walters to have interviewed Campbell before his death, but no one anticipated the precise direction that Campbell's life was taking so that he could be rushed to a psychologist. But the fact that Campbell was not interviewed before his death does not render inadmissible a psychologist's opinion based on the available data concerning Campbell's pre-injury and post-injury condition, physical and mental.

It is true that Willard Larsen and John Hall, as coemployees of Campbell, presented a different picture of him just before his death. Both Larsen and Hall testified that Campbell was an excellent employee, never missed shifts, was competent, and seemed to enjoy his work. They also did not observe that he was in pain or that he was depressed. This portrayal is markedly different from that provided by Campbell's wife, mother, and old friends. If, however, the employer believed this evidence to be so important, the employer could have submitted the information to the psychologist before he examined the available data and before he formed his opinion as to the reason Campbell committed suicide. Furthermore, the employer had ample opportunity to cross-examine the psychologist to test whether his opinion would have been changed by the testimony given by Larsen and Hall. Finally, the trial court had the opportunity of weighing this testimony, and the testimony was not considered that important to the trial court's conclusion that the 1974 injury was a substantial contributing cause to Campbell's suicide in 1979.

- 11 -

Our holding on the first two issues disposes of the third issue because, under section 39-71-611, MCA, if an employer denied liability for a claim that is later adjudged compensable in trial court or on appeal, the employer (insurer) "shall pay reasonable costs and attorney fees as established by the workers' compensation judge." Here both the trial court and this Court have determined the claim to be compensable and therefore costs and attorney fees must be awarded under the statute.

The order of the Workers' Compensation Court awarding death benefits to claimant is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

- 12 -